IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| VIVIAN KOSAN,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>UTAH DEPARTMENT OF<br>CORRECTIONS, et al.,<br><br>Defendants. | ORDER GRANTING SUMMARY<br>JUDGMENT<br><br><br><br><br>Case No. 2:06cv592 |

This case arises from Ms. Kosan's former employment with the Utah Department of
Corrections (the "DOC").  After she was fired, Ms. Kosan brought this action for employment
discrimination against the DOC, Mike Chabries, Scott Carver, Brandon Burr, Annabelle Brough,
and Dale Shipannboord, each as individuals and in their official capacities as employees of the
DOC (collectively, the "Defendants").  In her complaint, Ms. Kosan alleges six causes of action:
(1) a Title VII claim for hostile work environment; (2) a Title VII claim for sex discrimination;
(3) a Title VII claim for retaliation; (4) a civil claim for violation of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"); (5) violation of the Free Exercise Clause of the First
Amendment and comparable provisions of the Utah Constitution; and (6) violation of the Free

Speech Clause of the First Amendment and comparable provisions of the Utah Constitution.[1]

Before the court is the Motion for Summary Judgment of the Defendants (#18) in which they claim entitlement to judgment as a matter of law on each of Ms. Kosan's claims. For the reasons set forth below, the court agrees and, accordingly, GRANTS the Defendants' motion and enters summary judgment in their favor.

## FACTS

In setting forth the following undisputed facts, the court notes that many of the exhibits submitted by Ms. Kosan with her memorandum in opposition are the subject of the Defendant's Motion to Strike (#28). "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"[2] However, "the content or substance of the evidence must be admissible."[3] With this in mind, the court does not find it necessary to strike any of Ms. Kosan's exhibits in their entirety, but rather has disregarded any proffered evidence that would not be admissible at trial, such as inadmissable hearsay. Additionally, the court notes that much of the evidence objected to is immaterial to the court's decision.

Beginning on November 12, 2001, Ms. Kosan worked for the State of Utah, Department of Corrections, at the Central Utah Correctional Facility (the "CUCF") until her termination on

---

[1] Compl. (Docket No. 1).

[2] *Argo v. Blue Cross and Blue Shield, Inc.*, 452 F.3d 1193 (10th Cir. 2006) (quoting *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006)).

[3] *Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)) (internal quotation marks omitted).

July 11, 2005.[4]  The Title VII claims in this case arise from two administrative charges of employment discrimination against the DOC filed by Ms. Kosan with the Utah Antidiscrimination and Labor Division (the "UALD") and the Equal Employment Opportunity Commission (the "EEOC").  Her first charge was filed on September 7, 2004 (the "First UALD Charge"), claiming discrimination based on national origin and retaliation based on her complaining of sexual harassment.[5]  Her second charge was filed on August 25, 2005 (the "Second UALD Charge"), claiming retaliation based on her filing of the First UALD Charge.[6]

While Ms. Kosan has filed various causes of action, for purposes of disposing of the pending motion they can be conveniently grouped into three categories: (1) Title VII claims for hostile work environment and sex discrimination, (2) Title VII claims for retaliation, and (3) First Amendment claims.  The court will therefore briefly discuss the facts surrounding each of these three areas.

*Title VII Hostile Work Environment and Sex Discrimination Claims*

Ms. Kosan's hostile work environment and sex discrimination claims stem almost entirely from the alleged conduct of defendant Burr, her supervisor in the Helping Offenders Parole Effectively" Unit (the "HOPE Unit").[7]  Ms. Kosan began her employment with the DOC as a substance abuse counselor assigned to the HOPE Unit, where she remained until July 1,

---

[4] Compl. ¶ 12 (Docket No. 1).

[5] Kosan Dep. Ex. 1 (Docket No. 19 Ex. 1).

[6] *Id.* at Ex. 3.

[7] *See* Kosan Dep. at 17:2-19 (Docket No. 19 Ex. 1).

2003.[8]  Ms. Kosan initially complained of her treatment by Mr. Burr while attending Peace Officers Standards and Training ("Post") Academy between July and October of 2002.[9]  After her return to the HOPE Unit, Ms. Kosan was directly supervised by Wayne Larsen who reported to Mr. Burr and acted as a "buffer" between Ms. Kosan and Mr. Burr.[10]  On August 27, 2003, Ms. Kosan agreed to transfer to a Corrective Habilitative Technician Position (the "CHT Position") in order to avoid working under the supervision of Mr. Burr.[11]

In her complaint, Ms. Kosan claims that Mr. Burr verbally harassed her; repeatedly told sexually offensive jokes and stories to her and other staff members; exposed himself; physically and verbally intimidated her and other females; placed her in known dangerous situations in order to discourage her from continuing her employment; required her to use her married name instead of her maiden name; used inmates to spy on her; made disparaging sexist remarks about her and her husband; made unnecessary comments about inmates' genitalia; questioned her regarding her use of the bathroom; directed profanity at her and other staff members; and denied her licensing opportunities.[12]  Ms. Kosan claims that the DOC allowed each of the alleged actions to happen.[13]  She also alleges that the DOC denied her training opportunities and the opportunity

---

[8] Defs.' Mem. Supp. ¶ 2 (Docket No. 19); Pl.'s Mem. Opp'n 2 (Docket No. 24).

[9] *Id.* at 17-20.

[10] *Id.* at 22:23-23:24.

[11] *Id.* at 34:24-35:6.

[12] Compl. ¶ 14 (A)-(F), (H)-(L), (N) (Docket No. 1).

[13] *Id.* at ¶ 14.

to attend staff meetings, that she was reassigned to the mail room, that she was targeted for disciplinary actions based on standards not applied to male employees, and that someone "hack[ed] into [her] computer so that when she typed the word 'group', the words 'pretty woman' would appear."[14]

Excepting her allegations of uneven discipline, Ms. Kosan has acknowledged that the conduct alleged with respect to sex discrimination and hostile work environment ended with her transfer to the CHT Position in August of 2003, at the latest.[15]  Upon transfer to the CHT Position in August of 2003, Ms. Kosan was assigned to a new post in a different building with a different supervisor and rarely saw Burr.[16]  Mr. Burr no longer harassed Ms. Kosan after this August 2003 transfer.[17]

However, at least one of the events related to Ms. Kosan's claims of unfair discipline extends beyond August of 2003.  Ms. Kosan contends that while she was disciplined by Mr. Burr for not reporting a missing stapler — which event must have taken place before August of 2003 — Tom Hazen, a fellow employee, was not disciplined for falling asleep on the job.[18]  In her deposition, Ms. Kosan acknowledged that any other instances of unfair discipline were known to

---

[14] *Id.* at ¶ 14 (G), (M), (O), (P), (Q).

[15] *See* Defs.' Mem. Supp. ¶¶ 25-40 (Docket No. 19); Pl.'s Mem. Opp'n 4 (Docket No. 24); Kosan Dep. at 91:8-10, 96:4-13, 106:1-4, 108:12-14, 112:3-18, 113:17-19, 114:7, 117:10-11, 119:8-10, 121:17-19, 122:18-20, 126:25-127:4, 130:14-131:5, 131:24-134:4, 133:18-25, 156:13-157:8 (Docket No. 19 Ex. 1).

[16] Defs.' Mem. Supp. ¶¶ 46-48 (Docket No. 19); Pl.'s Mem. Opp'n 4 (Docket No. 24).

[17] Defs.' Mem. Supp. ¶ 49 (Docket No. 19); Pl.'s Mem. Opp'n 4 (Docket No. 24).

[18] Kosan Dep. 136:10-137:4 (Docket No. 19 Ex. 1).

her only through rumor.[19]

*Title VII Retaliation Claims*

As outlined above, Ms. Kosan initially complained of her treatment by Mr. Burr while attending POST Academy between July and October of 2002.[20]  Before filing the First UALD Charge, Ms. Kosan also complained or discussed the alleged harassment on the following occasions: (1) in a letter to the DOC's human resource director dated June 27, 2003;[21] (2) in a letter from the executive director of Ms. Kosan's union to the DOC's human resource director dated July 3, 2003;[22] (3) in an email to a correctional administrator dated July 18, 2003;[23] (4) in a grievance to a correctional administrator on August 18, 2003;[24] and (5) in a letter from the executive director of Ms. Kosan's union to the human resource director dated September 3, 2004.[25]

In the First UALD Charge, Ms. Kosan complains of retaliation as follows:

Since complaining of the sexual harassment I have been retaliated against by being denied attendance at staff meetings; placed in the mail room; and told there was a complaint against me but refused to give me any information on it.  I was forced to take a demotion, denied paid administrative and sick leave as well as my

---

[19] *Id.* at 136:14-17.

[20] *Id.* at 17-20.

[21] Pl.'s Mem Opp'n Ex. 3 (Docket No. 24).

[22] *Id.* at Ex. 4.

[23] *Id.* at Ex. 5.

[24] *Id.* at Ex. 6.

[25] *Id.* at Ex. 12.

bonus, and placed in a small room that used to be a closet to work.[26]
Ms. Kosan testified that the allegations concerning the staff meetings, the mail room, and the
demotion, referred to events that took place prior to, or simultaneously with, her transfer to the
CHT Position in August of 2003.[27]

The First UALD Charge was settled in its entirety by the parties in a Negotiated
Settlement Agreement (the "Settlement Agreement") signed by Ms. Kosan on January 6, 2005.[28]
In the Settlement Agreement, Ms. Kosan agreed to refrain from instituting a Title VII action
based on the First UALD Charge in exchange for the DOC's reinstating Ms. Kosan's
administrative and sick leave pay, keeping Mr. Burr out of her chain of command, conducting a
desk audit to consider her for a promotion, and refraining from retaliating against her.[29]

Ms. Kosan's claims for retaliation related to the Second UALD Charge are primarily
based on two disciplinary events against Ms. Kosan: (1) a suspension related to Kosan's
allegedly reporting misconduct outside her chain of command; and (2) her termination related to
Kosan's allegedly falsifying documents related to her hiring, training, and promotion.

On February 18, 2005, an internal administrative complaint was filed against Ms. Kosan,
alleging that she reported outside of her chain of command that she had been apprised by an
inmate that a fellow DOC employee, Tom Hazen, was sleeping while on duty (the "Hazen

---

[26] Kosan Dep. Ex. 1 (Docket No. 19 Ex. 1).

[27] *Id.* at 31:19-32:2; 39:9-15; 50:18-19; 133:18-25.

[28] *Id.* at Ex. 2.

[29] *Id.*

Incident").[30]  The complaint alleged that Ms. Kosan reported the alleged misconduct first to her immediate supervisor and then, dissatisfied with his response, to Lieutenant Rick Rasmussen, who was outside of both Kosan's and Hazen's chains of command, in violation of DOC procedure.[31]  Ms. Kosan was further accused of referring to Hazen as a "joke" in violation of the DOC's policy regarding professionalism, and of being "untruthful to a manager when responding to specific questions" regarding the alleged misconduct in violation of the DOC's policy entitled "Refusing to Answer Questions Related to Performance."[32]  The complaint invited a written response from Ms. Kosan and the opportunity for a hearing in front of defendant Brough, the DOC's Director of Institutional Operations.[33]

In her response, dated February 28, 2005, Ms. Kosan denied having violated any policy.[34] Additionally, Ms. Kosan asserted her belief that the investigation of the allegations in the complaint violated the Settlement Agreement, citing specifically to the provision in which the DOC promises not to retaliate against her.[35]  On March 18, 2005, Ms. Kosan met with Brough to discuss this response.[36]  The DOC issued a final order on March 23, 2005, finding that Ms.

---

[30] Pl.'s Mem Opp'n Ex. 15 (Docket No. 24).

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at Ex. 16.

[35] *Id.*

[36] Defs.' Mem. Supp. ¶ 65 (Docket No. 19); Pl.'s Mem. Opp'n 6 (Docket No. 24).

Kosan had violated the policies and procedures as charged, relying heavily on Ms. Kosan's having reported the sleeping incident outside of both her and Hazen's chains of command and then not following through with the instructions given to her to report the incident to Hazen's supervisor, Lieutenant Devin Blood.[37]  The order suspended Ms. Kosan for three days, holding two days of the recommended five-day suspension in abeyance for one year.[38]  Ms. Kosan appealed the final order to the Career Services Review Board (the "CSRB") on May 9, 2005, in which appeal she alleged that she had been "the continual target of malicious harassment" and that the final order was "inappropriate, unwarranted, retaliatory, and targeted in nature."[39]

In March of 2005, as per the Settlement Agreement, Ms. Kosan requested a desk audit to determine whether she qualified to be a Correctional Habilitative Specialist.[40]  Ms. Kosan submitted a Position Analysis Form ("PAF") in connection with the desk audit, which stated that she held a Bachelor of Arts degree.[41]  On May 11, 2005, Thomas McLelland, a human resource manager, wrote a letter to Ms. Kosan indicating that her personnel file did not include "copies of transcripts for the college degrees [she] indicate[d] receiving on both [her] application for employment and the position description questionnaire" filled out by her in connection with the

---

[37] Pl.'s Mem. Opp'n Ex. 17 (Docket No. 24).

[38] *Id.*

[39] *Id.* at Ex. 20.

[40] Defs.' Mem. Supp. ¶ 73 (Docket No. 19); Pl.'s Mem. Opp'n 11 (Docket No. 24).

[41] Brough Dec. ¶ 15 (Docket No. 19 Ex. 4); Pl.'s Mem. Opp'n 6 (Docket No. 24).

desk audit.[42]  The letter directed that "copies of all transcripts for degrees" be submitted to his

office by May 24, 2005.[43]  Ms. Kosan responded by letter dated May 19, 2005, indicating that she

did not have a liberal arts degree but claiming "BA equivalency."[44]

Upon learning that Ms. Kosan did not hold a Bachelor of Arts degree, Brough issued an

administrative complaint against Ms. Kosan charging her with violating the DOC's policies and

procedures regarding "Falsification of Reports and Records" and "Professionalism."[45]  The

complaint alleged that Kosan falsified three documents: (1) her "resume submitted with the State

of Utah Skill Match Resume Cover Sheet" — which states that she had a Bachelor of Arts degree

from Brigham Young University and from Snow College; (2) her POST application — which

stated that she had a "BA equivalency given by Snow College to teach"; and (3) on her PAF

submitted in connection with the 2005 desk audit — which stated that she "[had] been awarded

and brought with [her] [her] BA."[46]  The complaint finally indicates the intent of the DOC to

terminate Kosan for this alleged offense."[47]

On May 24, 2007, Ms. Kosan was given the complaint and escorted from the CUCF

---

[42] Pl.'s Mem. Opp'n Ex. 22 (Docket No. 24).

[43] *Id.*

[44] *Id.* at Ex. 23.

[45] *Id.* at Ex. 24.

[46] *Id.*

[47] *Id.*

property.[48]  Ms. Kosan was officially terminated in a final order dated July 11, 2007, which found

that Kosan violated the DOC's "Professionalism" procedure, which includes the following as

quoted in the order: "Falsification of [employment] application is grounds for denying

employment or for terminating employment if discovered after the applicant is hired."[49]  The

order claims that Ms. Kosan violated this procedure by falsifying her original employment

application, her POST application, and her PAF.[50]  Ms. Kosan appealed this decision to the

CSRB where the DOC's decision to terminate was initially upheld at the "Step 5" evidentiary

hearing,[51] but subsequently reversed by the CSRB in its Decision and Final Agency Action, dated

October 31, 2006.[52]  In its decision, the CSRB found that Ms. Kosan did not violate the DOC's

policies regarding falsification of documents and employment applications because she did not

do so with intent to mislead"[53]  The DOC appealed this decision to the Utah Court of Appeals,

where the parties settled in mediation.[54]

*First Amendment Claims*

On December 4, 2003, Ms. Kosan received a "Letter of Warning" from defendant

---

[48] Pl.'s Mem. Opp'n 12 (Docket No. 24); Defs.' Mem. Supp. 23 (Docket No. 19).

[49] Pl.'s Mem. Opp'n Ex. 28 (Docket No. 24).

[50] *Id.*

[51] *Kosan v. Utah Dep't of Corr.*, No. 9 CSRB 85, at 6 (Oct. 31, 2006) (Docket No. 24 Ex. 27).

[52] *Id.* at 16.

[53] *Id.* at 14, 15.

[54] Romano Dec. ¶¶ 10-11 (Docket No. 27 Ex. D).

Shipannboord, a DOC Program Services Director, accusing Ms. Kosan of violating the DOC's Code of Conduct in connection with her allegedly "telling Brandon Burr's LDS Stake President . . . about unsubstantiated allegations of misconduct by Mr. Burr."[55]  The letter sets forth the DOC's policy regarding "Staff Interaction/Communication," "Conflict of Interest,"and "Professional Standards and Ethics."[56]  The letter informs Ms. Kosan that "discussing [d]epartmental business, especially when that business is regarding other employees, with those in the community is damaging to those we work with and can ultimately affect agency morale."[57]

Subsequently, in a letter to Ms. Kosan dated August 11, 2004, Brough ordered Ms. Kosan to cease discussing the harassment allegations.[58]  The letter discusses various matters with regard to the alleged harassment, including the pay rate of Kosan's CHT Position and the terms of what appears to be a settlement offer.[59]  The letter closes by ordering Ms. Kosan to "not speak or bring up past issues regarding Mr. Burr with anyone" and further warning her that doing so would result in "disciplinary action, up to and including termination."[60]

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be

---

[55] Pl.'s Mem. Opp'n Ex. 8 (Docket No. 24).

[56] *Id.*

[57] *Id.*

[58] *Id.* at Ex. 10.

[59] *Id.*

[60] *Id.* at Ex. 10.

rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits . . . show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."[61]  In applying this standard, the

court must examine the evidence and reasonable inferences therefrom in the light most favorable

to the non-moving party.[62]  "The mere existence of a scintilla of evidence in support of the [non-

moving party's] position will be insufficient [to overcome summary judgment]; there must be

evidence on which the jury could reasonably find for [the non-moving party]."[63]

## DISCUSSION

Ms. Kosan filed this action in July of 2006 asserting multiple claims against the

Defendants.  Kosan's first three causes of action are Title VII  claims for hostile work

environment, sex discrimination, and retaliation.  Her fifth and sixth causes of action are based

on the First Amendment's protection of free speech and free exercise.  As Ms. Kosan concedes

her inability to prove the fourth cause of action, a civil RICO claim, the court confines its

discussion to her claims under Title VII and the First Amendment.

### I.  Title VII Claims

The DOC[64] claims entitlement to summary judgment as to Ms. Kosan's Title VII claims

based on the following theories: first, that the 300-day rule bars Title VII claims based on

---

[61] Fed. R. Civ. P. 56(c).

[62] *See Gaylor v. Does*, 105 F.3d 572, 574 (10th Cir. 1997).

[63] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[64] Ms. Kosan agrees that the DOC is the only proper defendant with regard to the Title VII claims.  Pl.'s Mem. Opp'n 28 (Docket No. 24).

conduct occurring more than 300 days before the filing of the First UALD Charge; second, that

in the Settlement Agreement Ms. Kosan waived her right to bring a Title VII claim with regard to

the events alleged in the First UALD Charge; and third, that the allegations of retaliation arising

from the Second UALD Charge fail as a matter of law.  The court considers each argument in

turn.

*The 300-day Rule*

The DOC contends that Ms. Kosan's claims for hostile work environment and sex

discrimination are time barred by the 300-day rule because the alleged conduct underlying these

claims ceased upon Ms. Kosan's transfer to the CHT department in August of 2003.  Ms. Kosan

argues that her claims are not affected by the 300-day rule because "the same conduct

perpetuated against [Ms. Kosan] by [Mr. Burr] was continued after her reassignment," and

because the DOC allegedly  failed "to provide [Ms. Kosan] the protections and rights afforded

under DOC policy," thus discouraging her from seeking her remedies.  The court agrees with the

DOC.

"Title VII requires a litigant to file a claim [with the UALD or the EEOC] within 300

days of the alleged discriminatory conduct."[65]   The Supreme Court has interpreted this period of

limitation strictly with regard to discrete acts of discrimination or retaliation, holding that such

"discrete discriminatory acts are not actionable if time barred, even when they are related to acts

---

[65] *Duncun v. Manager, Dep't of Safety, City and County of Denver*, 397 F.3d 1300, 1308
(10th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)).

alleged in timely filed charges."[66]   However, because claims of hostile work environment are by nature made up of multiple actions, where specific instances of conduct making up a single hostile work environment claim fall both within and without the 300-day period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."[67]

In this situation, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice."[68]   To determine whether a "series of alleged events comprises the same hostile environment," the court considers whether "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."[69]

The Supreme Court has also recognized that "[the] time period for filing a charge is subject to equitable doctrines such as tolling or estoppel."[70]   However, such doctrines "are to be applied sparingly."[71]   In the Tenth Circuit, "equitable tolling of the . . . Title VII time limitations is appropriate only where the circumstances of the case 'rise to the level of active deception

---

[66] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[67] *Id.* at 117.

[68] *Id.* at 120.

[69] *Duncan*, 397 F.3d at 1309 (quoting *Morgan*, 536 U.S. at 120) (internal quotation marks omitted).

[70] *Morgan*, 536 U.S. at 113.

[71] *Id.*

which might invoke the powers of equity to toll the limitations.'"[72]

The court finds that Ms. Kosan's first and second causes of action, for hostile work environment and sex discrimination, are barred by the 300-day rule. Although Ms. Kosan alleges numerous instances of conduct on behalf of Mr. Burr and the DOC — such as verbal assault, telling sexually offensive jokes and stories, and using excessive profanity — nearly all of this conduct stopped upon her transfer to the CHT Position in August of 2003, which is outside of the 300-day period directly proceeding her First UALD Charge, filed on September 7, 2004.[73] In this regard, the record directly contradicts Ms. Kosan's unsupported statement that "the same conduct [perpetrated] against [Ms. Kosan] by [Mr. Burr] was continued after her reassignment in August 2003."[74] In an effort to support this statement, Ms. Kosan specifically points to two types of conduct that allegedly continued beyond August of 2003: the denial of licensing opportunities toward obtaining certification as a Licensed Substance Abuse Counselor (an "LSAC") and the unfair disciplinary actions against her.[75]

Ms. Kosan offers no record citation for her claim that the licensing opportunity denials continued after the August 2003 transfer, but rather claims that upon transfer she "was no longer

---

[72] *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 615 (10th Cir. 1988) (quoting *Cottrell v. Newspaper Agency Corp.*, 590 F.2d 836, 838-39 (10th Cir. 1979)).

[73] *See* Defs.' Mem. Supp. ¶¶ 25-40 (Docket No. 19); Pl.'s Mem. Opp'n 4 (Docket No. 24); Kosan Dep. at 91:8-10, 96:4-13, 106:1-4, 108:12-14, 112:3-18, 113:17-19, 114:7, 117:10-11, 119:8-10, 121:17-19, 122:18-20, 126:25-127:4, 130:14-131:5, 131:24-134:4, 133:18-25, 156:13-157:8 (Docket No. 19 Ex. 1).

[74] *See* Pl.'s Mem. Opp'n 15 (Docket No. 24).

[75] *Id.*

able to continue with her LSAC training."[76]  Implicit in this statement is the recognition that any

denial of a licensing opportunity occurred at the latest in August of 2003, as the LSAC

certification was no longer relevant to Kosan's new CHT Position.[77]   Thus, any denial of

licensing opportunities did not continue after August of 2003 and are, accordingly, time-barred.

      With respect to her claims of unfair disciplinary action, Ms. Kosan asserts that co-worker

Tom Hazen was allegedly not disciplined for sleeping on the job while she was disciplined by

Mr. Burr for not reporting a stapler that was missing from her desk.[78]  She also argues that she

was wrongly disciplined for speaking to leaders in her church about Mr. Burr's alleged conduct

and for reporting Mr. Hazen's sleeping on the job.  Although each of these events, excepting the

stapler incident, apparently occurred after August of 2003, Ms. Kosan offers no evidence, other

than "gossip,"[79] that she was disciplined differently than other employees.  Accordingly, the court

cannot find that her bald assertion that Mr. Hazen went unpunished for sleeping on the job sets

forth an independent claim of employment discrimination.  Moreover, these events cannot be

considered part of her claim for hostile work environment, which is based on the crude, sexist,

profane, and hostile conduct allegedly perpetrated by Mr. Burr, as they involved discipline

imposed on Ms. Kosan for violating unrelated DOC policies and procedures by managers other

than Mr. Burr.

---

[76] *See* Pl.'s Mem. Opp'n 4, 5 (Docket No. 24); Defs.' Mem. Supp. ¶ 41 (Docket No. 19).

[77] *See* Kosan Dep. 131:24-132:4 (Docket No. 19 Ex. 1).

[78] *See id.* at 136:6-137:17.

[79] *Id.* at 137:15-17.

Ms. Kosan also appears to make an equitable argument that the DOC dissuaded her "from pursuing her federal rights" by not properly investigating her allegations according to established procedures and by unfairly disciplining her, as outlined above.  However, Ms. Kosan has not alleged that the DOC engaged in any active deception to prevent her from pursuing her Title VII claims.  Thus, any equitable argument of Ms. Kosan for tolling the 300-day rule is foreclosed.

Therefore, the court finds that the Defendants are entitled to judgment as a matter of law with regard to Kosan's first and second causes of action, Title VII hostile work environment and sex discrimination.

*Wavier Under the Settlement Agreement*

In early 2005, Ms. Kosan and the DOC entered into a Settlement Agreement pursuant to which Ms. Kosan agreed to refrain from bringing any Title VII claims against the DOC arising from the First UALD Charge in consideration of, among other things, a reinstatement of pay for administrative and sick leave and a promise to refrain from any retaliation.[80]  The DOC contends that pursuant to this agreement, Ms. Kosan waived her right to bring any Title VII claims in this court related to the First UALD Charge, including her claims of sex discrimination, hostile work environment, and retaliation.  Ms. Kosan argues that the DOC breached the Settlement Agreement when it retaliated against her subsequent to its execution, and therefore she should be permitted to carry forward a Title VII suit related to her First UALD Charge.

Courts have reached different conclusions on whether breach of a settlement agreement in which a complainant waives her right to sue for employment discrimination under Title VII

---

[80] *Id.* at Ex. 2.

entitles the complainant to revive the settled claims or whether her cause of action lies in breach

of contract.  Some courts have held that revival is only appropriate where the settlement

agreement was procured by fraud or duress.[81]  Others have held that a settled Title VII claim is

revived where the breach "relate[s] to a matter sufficiently substantial to justify invalidation of

the settlement agreement."[82]  However, the court need not decide the issue in this case because

the DOC has not retaliated against Ms. Kosan and therefore has not breached the Settlement

Agreement

*The Second UALD Charge - Retaliation*

In considering DOC's argument that it has not retaliated against Ms. Kosan, the court

must rely on the *McDonnell Douglas*[83] burden-shifting framework.[84]  First the plaintiff must

establish a prima facie case for retaliation: (1) "that he engaged in protected opposition to

discrimination, (2) that a reasonable employee would have found the challenged action materially

adverse, and (3) that a causal connection existed between the protected activity and the materially

adverse action."[85]  Upon setting forth a prima facie case, the burden then shifts to the defendant

---

[81] *See, e.g.*, *Breen v. Norwest Bank Minn., N.A.*, 865 F. Supp. 574, 577-78 (D. Minn. 1994).

[82] *See, e.g.*, *Melendez v. Horizon Cellular Tel. Co.*, 841 F. Supp. 687, 691 (E.D. Pa. 1994) (quoting *Spiridigliozzi v. Bethlehem Mines Corp., Cambria Division*, 558 F. Supp. 734, 736 n.1 (W.D. Pa. 1980)) (internal quotation marks omitted).

[83] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[84] *Argo*, 452 F.3d at 1202.

[85] *Id.* (footnote omitted).

"to articulate a legitimate, nondiscriminatory reason" for the adverse employment action.[86]

Should the defendant set forth such a reason, in order to avoid summary judgment the plaintiff

must then present sufficient evidence that a reasonable factfinder might conclude that the

"proffered explanation is a pretext for retaliation."[87]

a. Protected Activity

Protected activity includes both formal and informal complaints of Title VII

discrimination.[88] Here, the relevant allegations of protected activity engaged in by Ms. Kosan

include (1) her filing of the First UALD Complaint on September 7, 2004; (2) her responding to

the administrative complaint filed against her in connection with the Hazen Incident on February

28, 2005 (the "February 28 Response"); and (3) her appeal to the CSRB regarding the DOC's

final order with respect to the Hazen Incident filed on May 9, 2005 (the "May 9 Appeal"). The

DOC argues that any otherwise protected activity exhibited in Ms. Kosan's February 28

Response and May 9 Appeal was not undertaken in good faith and therefore should not be

considered protected activity. While the court agrees that a complaint of discrimination or

retaliation under Title VII must be undertaken in good faith in order to constitute protected

opposition,[89] simply alleging that Ms. Kosan was "trumping up Title VII violations" and staging

a "dress rehearsal for [the] eventual lawsuit against [the DOC]" is not enough to show that her

---

[86] *Id.*

[87] *Id.* at 1203.

[88] *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001).

[89] *See Viktron/Lika Utah v. Labor Commission*, 2001 UT App 394, ¶ 10 n.3, 38 P.3d 993, 996 n.3 (collecting federal circuit decisions).

complaints were not made with a good faith belief that she was being retaliated against.[90]

Accordingly the court finds that each of the above three instances are protected opposition under

Title VII.

        b.  Material Adverse Employment Action

      Title VII protects employees "not from all retaliation, but from retaliation that produces

injury or harm."[91]  Accordingly, in order to establish a prima facie claim for retaliation, the

plaintiff must show that the alleged adverse employment actions are "material" in that they

would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."[92]

With regard to the Second UALD Charge, filed on August 26, 2005, only those instances of

alleged retaliation that occurred in or after October of 2004 are relevant here because of the 300-

day rule outlined above.  This essentially includes two events: (1) the suspension arising from

Ms. Kosan's complaint against Hazen on March 23, 2005; and (2) her termination on July 11,

2005.[93]  The court concludes that these are materially adverse actions.

        c.  Causal Connection

      A Title VII plaintiff may establish a causal connection between the protected activity and

---

[90] *See* Defs.' Reply Mem. 29 (Docket No. 27).

[91] *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-15 (2006).

[92] *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).

[93] Ms. Kosan also claims in her statement of facts that she was removed from teaching a "Staying Sober Class" in December of 2004, and that her husband, also a DOC employee, received a letter of reprimand in March of 2005.  *See* Pl.'s Mem. Opp'n 10 (Docket No. 24). However, Ms. Kosan offers no argument as to why these events constitute material adverse employment action with which the court should be concerned.

the adverse employment action by showing that the events occurred in close temporal

succession.[94]   For causation to be established by temporal proximity alone, the actions must be

"*very closely* connected in time."[95]   However, a causal connection may also be shown through

"additional evidence" of internal investigations and complaints concerning the employee that

began shortly after the exercise of protected activity.[96]   For example, in *Piercy v. Makata*, the

Tenth Circuit considered an employee who was terminated fourth months after engaging in

protected activity, apparently too much time to establish a causal connection based on temporal

proximity alone.[97]   However, the court considered additional evidence that shortly after the

employee's filing of an EEOC complaint the employer began an investigation of the employee

that ultimately lead to her termination and therefore found that the plaintiff had met its prima

facie burden for purposes of summary judgment.[98]

Similar to the *Piercy* plaintiff, Ms. Kosan's July 11 termination does not appear, at first

blush, to be close enough in time to the May 9 appeal to establish causation based on temporal

proximity alone.   However, when considering the additional evidence that Ms. Kosan was issued

an administrative complaint and placed on leave on May 24, 2007, roughly two weeks after the

May 9 appeal, which ultimately lead to her termination, the court finds that Ms. Kosan has set

---

[94] *Piercy v. Makata*, 480 F.3d 1192, 1198 (10th Cir. 2007).

[95] *Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)) (internal quotations omitted).

[96] *Id.* at 1198-99.

[97] *Id.* at 1198.

[98] *Id.* at 1199.

forth a prima facie case for retaliation with regard to the July 11 termination.

The March 23 suspension resulting from the Hazen Incident creates a more difficult question. It was only after the DOC had issued a formal administrative complaint to Ms. Kosan regarding the Hazen Incident — the incident for which she was ultimately suspended — that Ms. Kosan engaged in the protected activity found in her February 28 response. Nonetheless, even assuming without deciding that this creates a causal connection, the issue of retaliation with regard to the March 23 suspension is unimportant because the DOC has set forth a legitimate non-discriminatory reason for the suspension, which Ms. Kosan has not successfully rebutted.

d. The DOC's Proffered Nonretaliatory Reasons

The DOC has affirmatively produced legitimate nonretaliatory reasons for the March 23 suspension and July 11 termination. As outlined in the administrative complaint[99] and the final order[100] associated with the Hazen Incident, the DOC explains that it suspended Ms. Kosan in March of 2005 because she reported Hazen's misconduct outside of her own and Hazen's chains of command, failed to follow through with the instructions given to her regarding the report, answered questions related to the investigation untruthfully, and referred to Hazen as a "joke," all in violation of the DOC's preexisting policies and procedures. As Ms. Kosan does not assert that these reasons are pretextual in her memorandum in opposition, the court has no reason to doubt their legitimacy.

With regard to the termination, the DOC explains, as indicated in the administrative

---

[99] Pl.'s Mem. Supp. Ex. 15 (Docket No. 24).

[100] *Id.* at Ex. 17.

complaint[101] and the final order[102] associated therewith, that it terminated Ms. Kosan's

employment because she falsified the PAF submitted in connection with her 2005 desk audit, as

well as her POST application and her original employment application.  As these are legitimate

reasons for a termination, the court must next consider Ms. Kosan's pretext arguments.

> e.  Ms. Kosan's Pretext Arguments

Ms. Kosan claims that the reasons proffered by the DOC for the July 11 termination are

merely pretext for retaliation because: (1) the CSRB ultimately determined that the DOC "did not

have cause to terminate [Ms. Kosan]"; (2) POST determined upon investigation that no

misrepresentations were present on Kosan's POST application; and (3) the events surrounding

the issuing of the administrative complaint on May 24, 2005, were suspicious.[103]

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies,

incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence and hence infer that the

employer did not act for the asserted non-discriminatory reasons."[104]  However, "[m]ere

conjecture" that the employer's reasons for the adverse employment action are pretext for

---

[101] *Id.* at Ex. 24.

[102] *Id.* at Ex. 28.

[103] Ms. Kosan also claims that the DOC allegedly admitted that the misrepresentations were not material.  However, as she has failed to provide the court with the material to which she cites in her memorandum for this proposition, the court considers only the three reasons listed.

[104] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).

retaliation is insufficient to avoid summary judgment.[105]  In making this determination, the court "examines the facts as they appear to the person making the decision."[106]

Pretext may also be shown by "evidence that the defendant's stated reason for the adverse employment action was false."[107]  However, the court "is not to act as a super personnel department that second guesses employers' business judgments."[108]  "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."[109]  It is not for the court to decide "whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."[110] Thus, even where the factfinder could reasonably believe the plaintiff's version of the facts, where the pretext claim is based upon weakness in the employer's evidence of employee misconduct, the plaintiff must demonstrate that such evidence "is so weak that a rational factfinder could infer that [the employer's] expressed reasons for

---

[105] *Id.* (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)) (internal quotation marks omitted).

[106] *Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (internal quotation marks omitted).

[107] *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[108] *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1329 (10th Cir. 1999)).

[109] *Rivera*, 365 F.3d at 925 (internal quotation marks omitted).

[110] *Id.* at 924-25 (internal quotation marks omitted).

terminating [the plaintiff] must have been pretextual."[111]

Ms. Kosan contends that pretext is shown first by the fact that the CSRB "found that the [DOC] did not have cause to terminate [her]."[112]  It is true that, after reviewing Ms. Kosan's administrative appeal of her termination, the CSRB found in her favor.  Specifically, the CSRB held that in order for the DOC to terminate her under the governing policies with respect to the falsification of records and employment applications, it had to show that in making the alleged false statements the employee intended to mislead the DOC.[113]  The CSRB therefore reversed the Step 5 administrative decision, which had upheld the DOC's decision to terminate.[114]

However, simply because the CSRB eventually found (with the benefit of hindsight and after extensive evidentiary proceedings) that the DOC lacked cause to terminate Ms. Kosan for document falsification, fails to prove that the DOC terminated Ms. Kosan for any reason other than a good faith belief that Ms. Kosan falsified documents.  The policies on which the DOC relied in the administrative complaint and termination order state that "[n]o member shall knowingly and intentionally . . . prepare, sign, and/or submit a false report, statement or affidavit" and that "[f]alsification of [employment] application is grounds for denying

---

[111] *Id.* at 925.

[112] *See* Pl.'s Mem. Opp'n 27 (Docket No. 24).

[113] *Kosan v. Utah Dep't of Corr.*, No. 9 CSRB 85, at 14 (Oct. 31, 2006) (Docket No. 24 Ex. 27).

[114] *Id.* at 7, 16.

employment or for terminating employment if discovered after the applicant is hired."[115]   The

findings of both the Step 5 and Step 6 decisions indicate that Ms. Kosan wrote the following on

her PAF: "I have been awarded and brought with me my BA and DMA in dance/history and

technique in French, Russian and Latin."[116]   In light of Kosan's admission that she does not hold

a Bachelor of Arts degree, it is not difficult to find that a decision maker reviewing the PAF

could conclude that this statement is plainly false.[117]

     The court recognizes that the CSRB decision comports with Ms. Kosan's claim that her

questionable statements on the PAF were actually "mistakes."   Although not specifically

addressed in the argument portion of Ms. Kosan's memorandum, the court has carefully

considered Ms. Kosan's version of the events surrounding the submission of the desk audit.   She

claims that shortly after realizing she made mistakes in completing the PAF, she attempted to

"clarify what she meant" with both her supervisor, Wayne Larsen, and the DOC employee

conducting the audit, Mike Tribe, but was told that the mistakes were not important.   But this

evidence is without much salience because it is unclear whether the clarification was done before

the possible falsification was discovered.[118]   She asserts somewhat vaguely that "upon realizing

---

[115] Pl.'s Mem. Opp'n Ex. 24, Ex. 28 (Docket No. 24).   The court notes that in its final order the DOC apparently relied upon a policy not mentioned in the administrative complaint. However, because neither Ms. Kosan nor the Defendants have made anything of this fact, the court has not considered it for purposes of this decision.

[116] *Kosan v. Utah Dep't of Corr.*, No. 9 CSRB 85, at 9 (Oct. 31, 2006) (Docket No. 24 Ex. 27).

[117] Pl.'s Mem. Opp'n Ex. 23 (Docket No. 24).

[118] *Cf.* U.S.S.G. § 5K2.18 (giving credit to voluntary disclosure of an offense to authorities, but only when this is done "prior to discovery of such offense").

that she had made two mistakes," she made correction efforts.[119]  This could well suggest that she

"realized" the mistake when others began to get suspicious.  Regardless of when she made an

effort at correction, it is clear that she only told Mr. Larsen and Mr. Tribe what she was doing.

They were not the moving forces on the termination, so her interactions with them could not,

without more, begin to prove pretext.  She also indicates that despite her requests, she received

no help in completing the form, and that she was surprised when her supervisor submitted the

audit as she had requested to review it with him before its submission.[120]  But she does not

explain with any precision how help would have changed her answers on the form; and once she

placed false information on form, it is really of little consequence how quickly it moved the

chain.

 More important, the fact that the Step 5 decision upheld the termination, finding that it

was "supported by substantial evidence," would indicate that the DOC's belief that its policies

had been violated was reasonably held.  Additionally, the DOC proffers that since 1996 it has

fired at least fifteen employees for falsification of some type of record.[121]  Thus, although a

reasonable factfinder with the benefit of hindsight could believe Ms. Kosan's version of the

events surrounding her termination and conclude that the DOC did not have cause to terminate

her, no reasonable factfinder could conclude that the DOC's proffered reasons are so full of

---

[119]  Pl.'s Mem. Opp'n 11 (Docket No. 24).

[120]  *Id.* at 11-12.

[121]  Brough Dec. ¶ 20 (Docket No. 19 Ex. 4).

"weaknesses, implausibilities, [and] inconsistencies" that they are "unworthy of credence."[122]

Second, Ms. Kosan points to the POST investigation of the alleged falsification of her POST application — upon which the DOC based, in part, its decision to terminate — which determined that she "did not enter false information" and did not "*purposely attempt to mislead* reviewers," although it cautioned her that her application statements could be "inadvertently" misleading.[123]   Again, even assuming that the POST investigation was correct, this does not render the DOC's proffered reasons unworthy of belief.   POST was, of course, reviewing its own single application, not all three applications at issue here.   Moreover, the alleged falsification of Ms. Kosan's POST application was not the sole basis upon which the DOC relied in making its decision to terminate.   Rather, the impetus of the investigation was the blatantly false statement on her PAF.[124]   It is worth highlighting again that Ms. Kosan stated:  "I have been awarded and brought with me my BA and DMA in dance/history and technique in French, Russian and Latin." Ms. Kosan claims that this was a "mistake," but this position strains credulity.   Both the complaint and the final order carefully considered the PAF along with two  allegedly falsified documents in making the decision to terminate.   Nothing in the record suggests that this was a pretextual maneuver.

Third, Ms. Kosan asserts that a finding of pretext is warranted by the fact that she "was given until 5:00 p.m. on May 24, 2005, to respond to the initial allegation, yet the [DOC] issued

---

[122] *Hilti*, 108 F.3d at 1323.

[123] Pl.'s Mem. Opp'n Ex. 25 (Docket No. 24).

[124] *Id.* at Ex. 28.

the administrative complaint before [Kosan's] deadline to respond and [then] walk[ed] [her] off the property."[125]  However, Ms. Kosan fails to mention that the "initial allegation" to which she refers is actually a letter dated May 11, 2005, asking that Ms. Kosan provide copies of her degree transcripts to the human resource office because they were not in her file[126] and that she responded in a letter dated May 19, 2005, admitting that she had no Bachelor of Arts degree.[127] Thus, even though Kosan technically had until 5:00 p.m. on May 24, 2005, to respond to the request for transcripts, her early response provided the DOC with the information upon which it relied in issuing the May 24 complaint.

Having considered Ms. Kosan's pretext arguments, the court finds that no reasonable factfinder could conclude that the DOC's proffered legitimate and nonretaliatory reasons for terminating Ms. Kosan's employment were so weak or implausible as to be unworthy of belief. Thus, as a matter of law the DOC did not retaliate against Ms. Kosan and, therefore, did not violate the Settlement Agreement.  Accordingly, the Defendants are entitled to summary judgment on Ms. Kosan's third cause of action, Title VII retaliation.

## II.  First Amendment Claims

Ms. Kosan claims that the DOC's order that she cease discussing her allegations of harassment against Mr. Burr, particularly with Burr's religious leader, violated her right to freely exercise her religion and her right to free speech.  The Defendants claim that they are entitled to

---

[125] *Id.* at 27.

[126] *Id.* at Ex. 22.

[127] *Id.* at Ex. 23.

summary judgment on each of Ms. Kosan's First Amendment claims.  The court agrees.  This being the case, the court need not consider the Defendants' claims of official immunity in their individual capacities.[128]

*Free Exercise Claim*

The Defendants argue that they are entitled to summary judgment on Ms. Kosan's free exercise claim because her right to free exercise was not substantially burdened and because any burden imposed thereon was due to a neutral DOC policy of general applicability.  Ms. Kosan contends that banning her from speaking to her religious clergy substantially burdened her right to free exercise and that in so doing the DOC targeted "religious orders that take a proactive approach to problems encountered by their members."[129]

In *Schrum v. City of Coweta*, the Tenth Circuit recently recognized that actions of executive agencies are subject to the Free Exercise Clause.[130]  In that case, an employee claimed that his public employer intentionally scheduled his shifts so as to interfere with his religious commitments.[131]  The court recognized that "mere failure of a government employer to accommodate the religious needs of an employee, where the need for accommodation arises from a conflict with a neutral and generally applicable employment requirement, does not violate the

---

[128] Ms. Kosan does not dispute the Defendants' assertion that her First Amendment claims are properly asserted against only the individual defendants in their capacities as individuals.

[129] Pl.'s Mem. Opp'n 31 (Docket No. 24).

[130] *Schrum v. City of Coweta*, 449 F.3d 1132, 1140-43 (10th Cir. 2006).

[131] *Id.* at 1144.

Free Exercise Clause."[132]  However, there was sufficient evidence in that case that the employer

actually intended to interfere with the employee's religious activities; therefore the court upheld

the lower court's denial of summary judgment.[133]

In December of 2003, Ms. Kosan received a "Letter of Warning" from Shipannboord

accusing Ms. Kosan of violating the DOC's Code of Conduct by "telling Brandon Burr's LDS

Stake President . . . about unsubstantiated allegations of misconduct by Mr. Burr."[134]  The letter

informs Kosan that "discussing Departmental business, especially when that business is

regarding other employees, with those in the community is damaging to those we work with and

can ultimately affect agency morale."[135]  Later, in an August 2004 letter, Brough ordered Ms.

Kosan to "not speak or bring up past issues regarding Mr. Burr with anyone" because "the

investigation, including the findings of the investigation, are confidential" and further warned her

that doing so would result in "disciplinary action, up to and including termination."[136]

The court finds that any burden on Ms. Kosan's right to freely exercise her religion was

imposed by the effectuation of a neutral policy of general applicability and therefore does not

infringe upon the Free Exercise Clause.  Among other things, the policies cited in the "Letter of

Warning" issued to Ms. Kosan prohibit "unauthorized disclosure of confidential or other

---

[132] *Id.* at 1143.

[133] *Id.* at 1144.

[134] Pl.'s Mem. Opp'n Ex. 8 (Docket No. 24).

[135] *Id.*

[136] *Id.* at Ex. 10.

classified information" and the "defam[ation] of administrators or staff."[137]  Accordingly, the order in the August 2004 letter to refrain from discussing the alleged harassment was not specifically directed to communications with Ms. Kosan's clergy, but rather to communications with "anyone" regarding the specified subject matter.

However, Ms. Kosan contends that the DOC's policies, and their implementation, are not neutral because they "target religious orders that take a proactive approach to problems encountered by their members."[138]  Yet, she does not offer any record citation for this assertion, apparently drawing it solely from the DOC's otherwise facially neutral policies.  The court finds no basis upon which to conclude that either the DOC's policies or their implementation with regard to Ms. Kosan, which allegedly prohibited Ms. Kosan from discussing the alleged harassment by Mr. Burr, are anything but neutral and of general applicability.  Therefore, Ms. Kosan's claim for violation of her free exercise rights fails.

*Free Speech Claim*

The Defendants argue that Ms. Kosan's free speech claims fail as a matter of law because the First Amendment does not protect employee speech that primarily addresses private concerns. Generally a state cannot demand that its employees give up First Amendment rights to free expression as a condition of employment.[139]  However, "when the government acts as an

---

[137] *Id.* at Ex. 8.

[138] *Id.* at 31.

[139] *Arndt v. Koby*, 309 F.3d 1247, 1251 (10th Cir. 2002).

employer, 'the First Amendment does not apply with full force.'"[140]  Accordingly, the

government may impose some job-related restrictions, even a prior restraint, on public employee

speech.[141]  A public employee's speech is entitled to First Amendment protection only where it

involves a matter of public concern.[142]  If the employee speech is about individual concerns or is

meant to redress personal grievances, the speech is not protected by the First Amendment and no

further analysis is needed, even where the employer has imposed a prior restraint.[143]

     The court determines whether speech addresses a matter of public concern as a matter of

law.[144]  "[S]peech of purely personal interest, or involving internal personnel disputes, is not of

public concern."[145]  In *David v. City and County of Denver* the Tenth Circuit specifically

addressed whether a public employee's speech regarding allegations of sexual harassment against

her public employer was a matter of public concern.[146]  The *David* court held that in this context

the relevant inquiry is whether the employee speaks in her role as an employee — primarily

seeking redress of personal grievances — or as a citizen — primarily addressing the broader

---

[140] *Id.* (quoting *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1270 (10th Cir. 1998)).

[141] *Id.*

[142] *Id.* at 1251-52.

[143] *Arndt*, 309 F.3d at 1252, 1255.

[144] *Id.* at 1252.

[145] *Id.*

[146] *David v. City and County of Denver*, 101 F.3d 1344, 1355-57 (10th Cir. 1996).

public interest in the employer's discharge of its governmental functions.[147]  Additionally, the court considered whether the employee's speech concerned allegations of harassment of other employees.[148]  The court ultimately held that the employee's speech was not a matter of public concern because it addressed solely his own grievance and neither made allegations of harassment against other employees nor implicated the employer's "performance of its governmental responsibilities."[149]

The court finds that Ms. Kosan's speech concerning her allegations of sexual harassment did not regard a matter of public concern.  The allegations essentially involve discussions between coworkers, not larger issues of departmental policy.  In contending otherwise, Ms. Kosan offers only the unsupported assertion that she "was deeply concerned with the [DOC's] failure to abide by state and federal law."  Ms. Kosan offers no record support for this statement, nor does she offer any other evidence that her speech concerned allegations of harassment of other employers or a failure by the DOC to carry out its governmental responsibilities.  Rather, Ms. Kosan argues that the DOC imposed a prior restraint on speech.[150]  However, as indicated above, regardless of the presence of a prior restraint, Ms. Kosan's employee speech is entitled to the protection of the First Amendment only if it involved a matter of public concern.  Accordingly, the court finds that Ms. Kosan's alleged employee speech was not a matter of

---

[147] *Id.* at 1355.

[148] *Id.* at 1356.

[149] *Id.*

[150] Pl.'s Mem. Opp'n 31-32 (Docket No. 24).

public concern and is therefore not entitled to the protection of the First Amendment.

CONCLUSION

For the reasons outlined above, the court hereby GRANTS Defendants' Motion for Summary Judgment (#18) on each of Ms. Kosan's six causes of action. However, Ms. Kosan's fifth and sixth causes of action also assert claims under the Utah Constitution that present important questions of state law. Accordingly, to the extent that Ms. Kosan's fifth and sixth causes of action arise under the Utah Constitution, the court hereby DISMISSES them WITHOUT PREJUDICE. The clerk's office is directed to close the case.

DATED this 2nd day of November, 2007.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge